UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------x

DEUTSCHE BANK TRUST COMPANY AMERICAS, in
    its capacity as successor indenture trustee for certain
    series of Senior Notes;

LAW DEBENTURE TRUST COMPANY OF NEW
    YORK, in its capacity as successor indenture trustee for
    certain series of Senior Notes; and

WILMINGTON TRUST COMPANY, in its capacity as
    successor indenture trustee for the PHONES Notes,

               Plaintiffs,

      vs.

BLACKROCK INSTITUTIONAL TRUST COMPANY,
    N.A. f/k/a Barclays Global Investors, N.A., in its
    capacity as trustee of its sponsored and administered
    collective investment funds;

BLACKROCK VARIABLE SERIES FUNDS, INC.;

ALLIANCE CAPITAL GROUP TRUST;

ARCHDIOCESAN PENSION PLAN OF THE
    ARCHDIOCESE OF NEW YORK;

BANK OF AMERICA, N.A., in its capacity as trustee of its
    sponsored and administered collective investment funds;

DEBORAH L. BRICE;

CITI CANYON, LTD.;

CITIGROUP PENSION PLAN TRUST, and its trustee,
    THE BANK OF NEW YORK MELLON, in its capacity
    as trustee thereof;

DEEPHAVEN EVENT TRADING LTD.;

DEEPHAVEN GROWTH OPPORTUNITIES TRADING
    LTD.;

DIOCESE OF BUFFALO LAY PENSION PLAN, by and
    through its BOARD OF TRUSTEES;

DORIS DUKE CHARITABLE FOUNDATION;

No. 11 Civ. 9319

**COMPLAINT**

1199SEIU GREATER NEW YORK PENSION FUND, by
and through its BOARD OF TRUSTEES;

1199SEIU HEALTH CARE EMPLOYEES PENSION
FUND, by and through its BOARD OF TRUSTEES;

1199SEIU HOME CARE EMPLOYEES PENSION FUND,
by and through its BOARD OF TRUSTEES;

EVOL CAPITAL MANAGEMENT, LLC;

FIDUCIARY TRUST COMPANY INTERNATIONAL;

FIRST NEW YORK SECURITIES LLC;

HAIDEE W. FLINDERS;

GABELLI ASSOCIATES FUND;

GABELLI MULTIMEDIA PARTNERS, L.P.;

GABELLI PERFORMANCE PARTNERSHIP, L.P.;

DONALD HORWITZ;

LOLA L. HORWITZ;

INTERNATIONAL UNION OF OPERATING
ENGINEERS LOCAL 14-14B PENSION FUND, by
and through its BOARD OF TRUSTEES;

iSHARES TRUST;

JPMORGAN TRUST II;

LANGDON STREET CAPITAL, L.P.;

LOCKHEED MARTIN CORPORATION;

LOEB ARBITRAGE B FUND LP;

LOEB OFFSHORE FUND, LTD.;

LOEB OFFSHORE B FUND, LTD.;

LOEB PARTNERS CORPORATION;

MASTER INVESTMENT PORTFOLIO;

MERCER FUNDS f/k/a MGI Funds;

NATIXIS FINANCIAL PRODUCTS LLC f/k/a Natixis
Financial Products Inc.;

NEW YORK CITY FIREFIGHTERS' VARIABLE
SUPPLEMENTS FUND;

2

OPPORTUNITY PARTNERS LP;                                        :

PAPER PRODUCTS, MISCELLANEOUS                                   :
    CHAUFFEURS, WAREHOUSEMEN, HELPERS,                        :
    MESSENGERS, PRODUCTION AND OFFICE                          :
    WORKERS LOCAL 27 PENSION FUND, by and                      :
    through its BOARD OF TRUSTEES;                             :

PAVERS AND ROAD BUILDERS DISTRICT COUNCIL                       :
    PENSION FUND, by and through its BOARD OF                  :
    TRUSTEES;                                                  :

QUANTITATIVE MASTER SERIES LLC f/k/a                            :
    Quantitative Master Series Trust;                         :

RBC CAPITAL MARKETS, LLC f/k/a RBC Capital                      :
    Markets Corporation;                                      :

REFORM PENSION BOARD TRUST, by and through its                  :
    BOARD OF TRUSTEES;                                         :

SCOTIA CAPITAL INC.;                                            :

STICHTING PENSIOENFONDS CAMPINA;                                :

TAX MANAGED OPPORTUNITY FUND, LLC;                              :

TE CALEL PORTFOLIO, LTD.;                                       :

THE  CHURCH PENSION FUND, in its individual and                 :
    trustee capacities;                                       :

THE CONSOLIDATED EDISON RETIREMENT PLAN,                        :
    and its trustee, STATE STREET BANK AND TRUST               :
    COMPANY, in its capacity as trustee thereof;              :

THE DREYFUS CORPORATION;                                        :

THE NORTHERN TRUST COMPANY, in its capacity as                  :
    trustee of the MASTER TRUST BETWEEN PFIZER                 :
    INC. AND THE NORTHERN TRUST COMPANY (as                    :
    successor to Wyeth Master Trust);                         :

THE READER'S DIGEST ASSOCIATION, INC.                          :
    RETIREMENT PLAN, and its trustee, THE                      :
    NORTHERN TRUST COMPANY, in its capacity as                 :
    trustee thereof;                                          :

THE TEACHERS' RETIREMENT SYSTEM OF THE                         :
    CITY OF NEW YORK, by and through THE                       :
    TEACHERS' RETIREMENT BOARD;                               :

TOMPKINS FINANCIAL CORPORATION f/k/a         :
    Tompkins TrustCo, Inc.; and                  :
                                                           :
UNITED TEAMSTERS PENSION FUND "A," by and    :
    through its BOARD OF TRUSTEES,           :
                                                              :
                          Defendants.            :
------------------------------------------------------------------------x

         Plaintiffs Deutsche Bank Trust Company Americas, in its capacity as successor indenture trustee for a certain series of Senior Notes (as hereinafter defined) ("**DBTCA**"), Law Debenture Trust Company of New York, in its capacity as successor indenture trustee for a certain series of Senior Notes (as hereinafter defined) ("**Law Debenture**"), and Wilmington Trust Company, in its capacity as successor indenture trustee for the PHONES Notes (as hereinafter defined) ("**Wilmington Trust**" and, together with DBTCA and Law Debenture, "**Plaintiffs**"), by and through their undersigned counsel, respectfully allege as follows:

## NATURE OF THE ACTION

         1.     This action arises from the failed leveraged buyout (the "**LBO**") of Tribune Company ("**Tribune**") in 2007 — a transaction that financial and industry analysts contemporaneously characterized as one of the most highly leveraged in history.  The LBO lined the pockets of Tribune's former shareholders (the "**Shareholders**") with $8.3 billion of cash at the expense of Tribune's creditors, and precipitated Tribune's careen into bankruptcy shortly thereafter.

         2.     Plaintiffs seek to avoid and recover, as constructively fraudulent conveyances, all transfers of any proceeds received by each defendant in connection with the LBO.  These transfers may be recovered from the defendants because: (a) Tribune made the

challenged transfers without receiving reasonably equivalent value or fair consideration in exchange therefor; and (b) the challenged transfers were made when Tribune (i) was, or was thereby rendered, insolvent, (ii) was engaged, or was about to engage, in a business or a transaction for which any property remaining with Tribune was an unreasonably small capital, or (iii) intended to incur, or believed that it would incur, debts that would be beyond Tribune's ability to pay as such debts matured.

*       *       *

3.      In mid-2006, Tribune's consolidated revenue was plummeting, its prospects were dimming, and its stock price had dropped to around $27 per share from a high of nearly $40 just twelve months earlier.  The largest Shareholders desperately wanted, and ultimately found, an exit strategy: On April 1, 2007, Tribune's board of directors (the "**Tribune Board**") approved a bid by billionaire Samuel Zell ("**Zell**") to acquire Tribune through an extraordinarily leveraged buyout.

4.      In its most basic form, a leveraged buyout is a corporate acquisition where the acquirer purchases the outstanding stock of a target company using borrowed funds that are guaranteed by, or secured by the assets of, the target company itself.  Because leveraged buyout transactions replace the target company's outstanding equity with new debt, the law recognizes that LBOs are inherently risky to the target company's existing creditors and invite application of fraudulent-transfer law when the target company is left unable to satisfy its obligations to its pre-LBO creditors.  As aptly described by one court, "[f]rom a creditor's point of view, an LBO is indistinguishable from a distribution or a gift to shareholders.  The harm is quite like the harm imposed on creditors by donative transfers to third parties, which is one of the most traditional

kinds of fraudulent transfers." Indeed, it is the cashed-out shareholders who receive the principal

benefit in an LBO transaction; the target corporation, on the other hand, receives absolutely no

benefit to offset the greater risk of operating as a highly leveraged enterprise.

5.     Before the LBO, Tribune and its direct and indirect subsidiaries

(collectively, the "**Company**") had approximately $5.6 billion of funded debt obligations and a

positive equity value. As a result of the LBO, however, the Company increased its funded debt

obligations by more than $8 billion and Tribune had a negative equity value.

6.     The LBO was designed as a single transaction that would be implemented

in two steps. Tribune executed the first step of the LBO ("**Step One**") on June 4, 2007, paying

some of the Shareholders $4.3 billion (the "**Step One Shareholder Transfers**") for 52% of the

outstanding stock at a premium price of $34 per share. Tribune executed the second step of the

LBO ("**Step Two**") on December 20, 2007, paying Shareholders another $4 billion (the "**Step**

**Two Shareholder Transfers**" and, together with the Step One Shareholder Transfers, the

"**Shareholder Transfers**") for the remaining outstanding stock, also at the premium price of $34

per share. This transaction was a textbook fraudulent conveyance.

7.     Tribune received, and the Shareholders gave, no value whatsoever in

exchange for the Shareholder Transfers. To the contrary, Tribune only received the dubious

honor of repurchasing its own stock, and a bloated debtload that increased to more than

$13 billion — billions more than Tribune was actually worth, and nearly ten times the

Company's cash flow for 2006 or projected cash flow for 2007. This highly leveraged capital

structure was nothing short of reckless.

8.     The Company was a terrible candidate for an LBO.  Nearly two-thirds of the Company's cash flow was generated from its newspaper businesses.  At the time of the LBO, the publishing industry was in the midst of a deepening, well-publicized structural decline.  Print circulation and advertising revenues were falling at a rapid clip across the entire industry as readership migrated online and to other media outlets.  The consensus among analysts, market participants, and rating agencies in 2007 was that these challenges were not cyclical and that the declines in circulation and advertising were not likely to abate anytime soon — if ever.

9.     To make matters worse, the Company significantly underperformed industry averages during the years and months leading up to the LBO.  In fact, just months before the close of Step One, both management and independent analysts reported that daily circulation for the Company's largest newspapers was decreasing at a more precipitous rate than the industry average decline.  Consequently, management had no reason to assume that circulation or advertising revenue would improve over the long term or that the Company could make up any shortfalls.

10.    At the time Step One closed, the Company had already failed to meet management's projections for the first several months of 2007.  As of May 2007, year-to-date operating cash flow for the publishing segment was significantly lower than projected, and less than the prior year's actual results for the same period.  In fact, one of Tribune's largest newspapers was reported to have had "one of the worst quarters ever experienced" in the second quarter of 2007.  Consequently, just to meet full-year projections for 2007, the Company would have had to achieve an impossible trifecta during the second half of the year: turn around the

negative trend, <u>and</u> recoup the performance deficiencies from the first half, <u>and</u> significantly

exceed 2006 performance.

11.     The Company did not achieve any of these objectives.  Rather, between

the close of Step One and Step Two, the Company's financial and operating performance

continued to deteriorate as significantly as it did rapidly.  As a result, financial and industry

analysts repeatedly downgraded their expectations for the Company's performance, Tribune's

stock price traded below $23 (a discount of more than 25% to the tender offer price of $34 per

share), and Tribune's bond prices fell to almost 50 cents on the dollar for certain tranches of

Tribune's longer term debt.

12.     Market watchers and the media had long predicted and widely publicized

that the LBO would ruin Tribune.  It did.  Before the close of Step Two, it was clear that the

Company would be unable to meet its operating expenses from existing resources and shortly

would be in a full-blown liquidity crisis.  Less than one year later, buried in debt, and facing a

bleak future of looming debt maturities and overwhelming interest payments, Tribune and the

majority of its subsidiaries jointly filed for bankruptcy on December 8, 2008 (the "**<u>Petition</u>**

**<u>Date</u>**").

13.     The jointly administered bankruptcy cases are currently pending in the

United States Bankruptcy Court for the District of Delaware (the "**<u>Bankruptcy Court</u>**"), Case

No. 08-13141 (KJC).  On April 25, 2011, the Bankruptcy Court entered an order (the "**<u>Standing</u>**

**<u>Order</u>**") that, in pertinent part (a) granted Plaintiffs relief from the automatic stay, to the extent it

is applicable, to commence this action and accomplish service; and (b) ordered that this action

shall be automatically stayed pending further order of the Bankruptcy Court.  Notwithstanding

the foregoing, the Standing Order expressly authorized Plaintiffs immediately to pursue, among other things, discovery as necessary to prevent any applicable statutes of limitation or time-related defenses from barring the claims asserted in this action.  A copy of the Standing Order is appended hereto as Exhibit B.

14.     On June 28, 2011, the Bankruptcy Court entered an order (the "**Clarification Order**") that, in pertinent part, supplemented the Standing Order to authorize any party to move pursuant to 28 U.S.C. § 1407 to consolidate or coordinate this action with any or all of the other related actions commenced by Plaintiffs.  A copy of the Clarification Order is appended hereto as Exhibit C.

## THE PARTIES

**I.     Plaintiffs**

15.     Plaintiff DBTCA is a trust company incorporated in the State of New York with its principal place of business in New York, New York.  DBTCA is the successor indenture trustee for, and has been duly designated to prosecute and resolve the claims asserted herein on behalf of the holders of, the following debt securities issued by Tribune:

(a)     the 6.25% Notes due November 10, 2026, pursuant to the indenture, dated as of March 1, 1992, between Tribune and Citibank, N.A. ("**Citibank**") as trustee, successor to The Bank of New York ("**BNY**"), Bank of Montreal Trust Company ("**BMT**"), and Continental Bank, N.A.;

(b)     the 7.25% Debentures due March 1, 2013, pursuant to the indenture, dated as of January 30, 1995 (the "**1995 Indenture**"), between Tribune, successor to The Times Mirror Company ("**Times Mirror**"), and

Citibank as trustee, successor to BNY, Wells Fargo Bank, N.A. and First Interstate Bank of California;

(c)     the 7.50% Debentures due July 1, 2023, pursuant to the 1995 Indenture;

(d)     the 4.875% Notes due August 15, 2010, pursuant to the indenture, dated as of January 1, 1997 (the "**1997 Indenture**"), between Tribune and Citibank, as trustee, successor to BMT;

(e)     the 5.25% Notes due August 15, 2015, pursuant to the 1997 Indenture; and

(f)     the 5.67% Notes due December 8, 2008, pursuant to the 1997 Indenture.

16.     Plaintiff Law Debenture is a trust company incorporated in the State of New York with its principal place of business in New York, New York.  Law Debenture is the successor indenture trustee to DBTCA for, and has been duly designated to prosecute and resolve the claims asserted herein on behalf of, the holders of the following debt securities issued by Tribune:

(a)     the 6.61% Debentures due September 15, 2027, pursuant to the indenture, dated as of March 19, 1996 (the "**1996 Indenture**"), by and between Tribune, successor to Times Mirror, and Citibank, as trustee; and

(b)      the 7.25% Debentures due November 15, 2096, pursuant to the 1996 Indenture.

17.     The debt securities referred to in the two preceding paragraphs collectively have a total face amount of approximately $1.263 billion, and collectively are referred to herein as the "**Senior Notes**."  As of the Petition Date, Tribune owed $1.283 billion, exclusive of accrued post-petition interest, to the holders of the Senior Notes.

18.     Plaintiff Wilmington Trust is a trust company incorporated in the State of Delaware with its principal place of business in Wilmington, Delaware.  Wilmington Trust is the successor indenture trustee for, and has been duly designated to prosecute and resolve the claims asserted herein on behalf of the holders of Exchangeable Subordinated Debentures due 2029 (the "**PHONES Notes**"), pursuant to the indenture, dated as of April 1, 1999 between Tribune and BMT, as trustee.  As of the Petition Date, Tribune owed $1.197 billion, exclusive of accrued post-petition interest, to the holders of the PHONES Notes.

19.     The holders of the Senior Notes and the PHONES Notes, as well as their respective successors and assigns, collectively are referred to herein as the "**Pre-LBO Noteholders**."  The Pre-LBO Noteholders have unsatisfied claims against Tribune for the payment of money on account of the Senior Notes and the PHONES Notes in an amount of no less than $2.480 billion (the "**Pre-LBO Noteholder Claims**"), exclusive of accrued post-petition interest.

20.     At the time the Step One Shareholder Transfers were made, the Senior Notes and the PHONES Notes were issued and outstanding.

21.     At the time the Step Two Shareholder Transfers were made, the Senior Notes and the PHONES Notes were issued and outstanding.

11

## II.    **Defendants**

22.    Upon information and belief, defendant BlackRock Institutional Trust Company, N.A. f/k/a Barclays Global Investors, N.A., in its capacity as trustee of its sponsored and administered collective investment funds, is a national banking association with its main office in San Francisco, California.  In this capacity, BlackRock Institutional Trust Company, N.A. is the sponsor and administrator of various collective investment funds (as defined in 12 C.F.R. § 9.18(a)) (*e.g.*, commingled trust funds maintained by a national bank, participation in which is limited to qualified tax-exempt retirement, pension plans, profit-sharing, stock bonus, or other trusts exempt from federal income tax).  Upon information and belief, BlackRock Institutional Trust Company, N.A. maintained several collective investment funds that legally or beneficially owned Tribune common stock purchased, repurchased, or redeemed by Tribune in connection with the LBO or received proceeds of the Shareholder Transfers, including at least the following collective investment funds:

   (a)  Equity Index Fund;

   (b)  Equity Index Fund B;

   (c)  Equity Index Plus Fund A;

   (d)  Equity Value Fund;

   (e)  Russell 1000 Alpha Tilts Fund BL;

   (f)  Russell 1000 Index Fund;

   (g)  Russell 1000 Value Fund;

   (h)  Russell 1000 Value Fund B;

   (i)  Russell 2500 Index Fund;

      (j)      Russell 300 Index Fund;

      (k)      US Equity Market Fund A;

      (l)      US Equity Market Fund B; and

      (m)      US Equity Market Sudan Free Equity Index Fund.

Upon information and belief, BlackRock Institutional Trust Company, N.A. regularly solicits and transacts substantial business in, and derives substantial revenue from, this State.

23.      Upon information and belief, defendant BlackRock Variable Series Funds, Inc. is a Maryland corporation and an open-end management investment company registered under the Investment Company Act of 1940, with its principal executive offices at 55 East 52nd Street, New York, New York 10055.  Upon information and belief, BlackRock Variable Series Funds, Inc. maintains certain funds (and issues shares of beneficial interests in such funds) that legally or beneficially owned Tribune common stock purchased, repurchased, or redeemed by Tribune in connection with the LBO or received proceeds of the Shareholder Transfers, including at least the following fund:  BlackRock S&P 500 Index V.I. Fund.

24.      Upon information and belief, defendant Alliance Capital Group Trust is a pooled investment vehicle (affiliated with its investment adviser, AllianceBernstein L.P.) through which qualified institutions, such as pension, profit-sharing, stock bonus, and governmental plans, may commingle their assets.  Upon information and belief, shares or units of Alliance Capital Group Trust are privately offered and exempt from registration under the Investment Company Act of 1940.  Upon information and belief, Alliance Capital Group Trust's principal place of business is 1345 Avenue of the Americas, New York, New York 10105, with additional operations at 1 North Lexington Avenue, White Plains, New York 10606.

25.     Upon information and belief, defendant Archdiocesan Pension Plan of the Archdiocese of New York is a non-contributory employer pension plan sponsored by the Archdiocese of New York, with its principal place of business at the Pension Office, 1011 First Avenue, Floor 16, New York, New York 10022.

26.     Upon information and belief, defendant Bank of America, N.A., in its capacity as trustee of its sponsored and administered collective investment funds, is a national banking association with its main office in Charlotte, North Carolina, as well as branches and additional executive offices in New York, New York.  In this capacity, Bank of America, N.A. is the sponsor and administrator of various collective investment funds (as defined in 12 C.F.R. § 9.18(a)) (*e.g.*, commingled trust funds maintained by a national bank, participation in which is limited to qualified tax-exempt retirement, pension plans, profit-sharing, stock bonus, or other trusts exempt from federal income tax).  Upon information and belief, Bank of America, N.A. (or its predecessors in interest) maintained collective investment funds that legally or beneficially owned Tribune common stock purchased, repurchased, or redeemed by Tribune in connection with the LBO or received proceeds of the Shareholder Transfers, including at least the following collective investment funds:

(a)     Equity Index Trust (a/k/a Merrill Lynch Equity Index Trust), a collective investment fund for which Bank of America, N.A. succeeded Merrill Lynch Bank USA as trustee upon the merger of Merrill Lynch Bank USA with and into Bank of America, N.A.; and

(b)     Large Cap Value Index Trust (a/k/a Merrill Lynch Large Cap
        Value Index Trust a/k/a Large Cap Value Index Trust of QA
        Collective Trust Series a/k/a Large Cap Value Index Trust of
        Merrill Lynch QA Collective Trust Series), a collective investment
        fund for which Bank of America, N.A. succeeded Merrill Lynch
        Bank & Trust Co., F.S.B. as trustee upon the merger of Merrill
        Lynch Bank & Trust Co., F.S.B. with and into Bank of America,
        N.A.

27.     Upon information and belief, defendant Deborah L. Brice is a natural person residing in this State.

28.     Upon information and belief, defendant Citi Canyon, Ltd. is a Cayman Islands exempt company with a registered address at Maples Corporate Services Limited, P.O. Box 309, Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands and its actual places of business at Los Angeles, California and at 152 West 57th Street, 25th Floor, New York, New York  10019.

29.     Upon information and belief, defendant Citigroup Pension Plan Trust is a trust established in connection with the Citigroup Pension Plan, a defined benefit plan sponsored by Citigroup Inc. and participating affiliates thereof, with its administrative offices at One Court Square, 15th Floor, Long Island City, New York 11120.

30.     Upon information and belief, defendant Deephaven Event Trading Ltd. is a Cayman Islands exempted company with its registered address at M&C Corporate Services Limited, Ugland House, South Church Street, George Town, Grand Cayman  KY1-1104,

15

Cayman Islands.  Upon information and belief, defendant Deephaven Event Trading Ltd. regularly solicits and transacts substantial business in this State.

31.     Upon information and belief, defendant Deephaven Growth Opportunities Trading Ltd. is a British Virgin Islands exempted company with its registered address at HWR Services, Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands.  Upon information and belief, defendant Deephaven Growth Opportunities Trading Ltd. regularly solicits and transacts substantial business in this State.

32.     Upon information and belief, defendant Diocese of Buffalo Lay Pension Plan, by and through its Board of Trustees, is a defined benefit church pension plan sponsored by the Diocese of Buffalo, with its principal place at 795 Main Street, Buffalo, New York 14203.

33.     Upon information and belief, defendant Doris Duke Charitable Foundation, by and through its Board of Trustees, is a federal-tax-exempt, private foundation formed as a trust under the laws of New York, with its headquarters at 650 Fifth Avenue, 19th Floor, New York, New York 10019.

34.     Upon information and belief, defendant 1199SEIU Greater New York Pension Fund, by and through its Board of Trustees, is a non-contributory,  multi-employer defined benefit plan, established pursuant to a written trust agreement and administered by its Board of Trustees, with its principal place of business at 330 West 42nd Street, 10th Floor, New York, New York 10036.

35.     Upon information and belief, defendant 1199SEIU Health Care Employees Pension Fund, by and through its Board of Trustees, is a non-contributory, multi-employer defined benefit plan, established pursuant to a written trust agreement and

administered by its Board of Trustees, with its principal place of business at 330 West 42nd Street, New York, New York 10036.

36.     Upon information and belief, defendant 1199SEIU Home Care Employees Pension Fund, by and through its Board of Trustees, is a non-contributory,  multi-employer defined benefit plan, established pursuant to a written trust agreement and administered by its Board of Trustees, with its principal place of business at 330 West 42nd Street, New York, New York 10036.

37.     Upon information and belief, defendant EVOL Capital Management, LLC is a Delaware limited liability company with its principal place of business in New York, New York.

38.     Upon information and belief, defendant Fiduciary Trust Company International is New York corporation with its principal place of business at 600 Fifth Avenue, 4th Floor, New York, New York 10020-2302.

39.     Upon information and belief, defendant First New York Securities LLC is a New York limited liability company with its principal place of business at 90 Park Avenue, 5th Floor, New York, New York 10016.

40.     Upon information and belief, defendant Haidee W. Flinders is a natural person residing in this State.

41.     Upon information and belief, Gabelli Associates Fund is a New York limited partnership with its principal place of business at One Corporate Center, Rye, New York 10580.

42.     Upon information and belief, defendant Gabelli Multimedia Partners, L.P. is a Delaware limited partnership with its principal place of business at One Corporate Center, Rye, New York 10580.

43.     Upon information and belief, defendant Gabelli Performance Partnership, L.P. is a Delaware limited partnership with its principal place of business at One Corporate Center, Rye, New York 10580.

44.     Upon information and belief, defendant Donald Horwitz is a natural person residing in this State.

45.     Upon information and belief, defendant Lola L. Horwitz is a natural person residing in this State.

46.     Upon information and belief, defendant International Union of Operating Engineers Local 14-14B Pension Fund, by and through its Board of Trustees, is a multi-employer defined benefit plan, established pursuant to a written trust agreement and administered by its Board of Trustees, with its principal place of business at 141-57 Northern Boulevard, Flushing, New York 11354-4238.

47.     Upon information and belief, defendant iShares Trust is a Delaware statutory trust and an open-end management investment company registered under the Investment Company Act of 1940 and authorized to have multiple series or portfolios, with its principal place of business in San Francisco, California.  Upon information and belief, iShares Trust's series and portfolios include several exchange-traded funds that legally or beneficially owned Tribune common stock purchased, repurchased, or redeemed by Tribune in connection

with the LBO or received proceeds of the Shareholder Transfers, including at least the following funds:

    (a)    iShares Dow Jones U.S. Consumer Services Sector Index Fund;

    (b)    iShares Dow Jones U.S. Index Fund f/k/a iShares Dow Jones U.S. Total Market Index Fund;

    (c)    iShares Morningstar Mid Value Index Fund ;

    (d)    iShares Russell 1000 Index Fund;

    (e)    iShares Russell 1000 Value Index Fund;

    (f)    iShares Russell 3000 Index Fund;

    (g)    iShares Russell 3000 Value Index Fund;

    (h)    iShares Russell MidCap Index Fund;

    (i)    iShares Russell MidCap Value Index Fund;

    (j)    iShares S&P 500 Index Fund; and

    (k)    iShares S&P 500 Value Index Fund.

Upon information and belief, iShares Trust continuous and systematically solicits and transacts substantial business in, and derives substantial revenue, from this State.

48. Upon information and belief, defendant JPMorgan Trust II is a Delaware statutory trust and open-end management investment company registered under the Investment Company Act of 1940, with its principal place of business at 270 Park Avenue, New York, New York 10017. JPMorgan Trust II maintains certain funds (and issues shares of beneficial interest in such portfolios) that legally or beneficially owned Tribune common stock purchased, repurchased, or redeemed by Tribune in connection with the LBO or received proceeds of the Shareholder Transfers, including at least the following fund: JPMorgan Equity Index Fund.

19

49.     Upon information and belief, defendant Langdon Street Capital, L.P. is a Delaware limited partnership with its principal place of business at 555 Fifth Avenue, 14th Floor, New York, New York 10017.

50.     Upon information and belief, defendant Lockheed Martin Corporation is a Maryland corporation registered to do business in this State with offices at 420 Lexington Avenue, New York, New York 10170.  Upon information and belief, Lockheed Martin Corporation legally or beneficially owned Tribune common stock purchased, repurchased, or redeemed by Tribune in connection with the LBO or received proceeds of the Shareholder Transfers in an account in its own name on behalf of one or more employee benefit plans or trusts sponsored by it, the identity of which plans or trusts will be determined in discovery.

51.     Upon information and belief, defendant Loeb Arbitrage B Fund LP is a Delaware limited partnership with its principal place of business at 61 Broadway, 24th Floor, New York, New York 10006.

52.     Upon information and belief, defendant Loeb Offshore Fund, Ltd. is a Cayman Islands exempted company with a registered address of Clifton House, 75 Fort Street, Grand Cayman KY1-1108, Cayman Islands and its actual place of business at 61 Broadway, 24th Floor, New York, New York 10006.

53.     Upon information and belief, defendant Loeb Offshore B Fund, Ltd. is a Cayman Islands exempted company with a registered address of Clifton House, 75 Fort Street, Grand Cayman KY1-1108, Cayman Islands and its actual place of business at 61 Broadway, 24th Floor, New York, New York 10006.

54.     Upon information and belief, defendant Loeb Partners Corporation is a Delaware corporation with its principal place of business at 61 Broadway, 24th Floor, New York, New York 10006.

55.     Upon information and belief, defendant Master Investment Portfolio is a Delaware statutory trust and an open-end, series management investment company, with its principal place of business in San Francisco, California, and additional offices in New York, New York, including the office of its Chief Executive Officer at 55 East 52nd Street, New York, New York 10055.  Upon information and belief, Master Investment Portfolio includes certain portfolios (and issues shares of beneficial interest in such portfolios) that legally or beneficially owned Tribune common stock purchased, repurchased, or redeemed by Tribune in connection with the LBO or received proceeds of the Shareholder Transfers, including at least the following portfolio:  S&P 500 Stock Master Portfolio.

56.     Upon information and belief, defendant Mercer Funds f/k/a MGI Funds is a Delaware statutory trust and open-end management investment company with its principal place of business in Boston, Massachusetts and an additional place of business at 1166 Avenue of the Americas, New York, New York 10166.  Upon information and belief, Mercer Funds regularly solicits and transacts substantial business in this State.  Upon information and belief, Mercer Funds includes certain funds (and issues shares of beneficial interest in such funds) that legally or beneficially owned Tribune common stock purchased, repurchased, or redeemed by Tribune in connection with the LBO or received proceeds of the Shareholder Transfers, including at least the following fund:  Mercer US Small/Mid Cap Value Equity Fund f/k/a MGI US Small/Mid Cap Value Equity Fund.

21

57.     Upon information and belief, defendant Natixis Financial Products LLC f/k/a Natixis Financial Products Inc. is a Delaware limited liability company with its principal place of business at 9 West 57th Street, New York, New York 10019.

58.     Upon information and belief, defendant New York City Firefighters' Variable Supplements Fund is a fund established under the Administrative Code of the City of New York, endowed under § 13-386 thereof with the attributes of a corporation, and administered by a Board of Trustees, with the Comptroller of the City of New York as the custodian of its monies and assets.  The fund's principal place of business is located at 9 MetroTech Center, Brooklyn, New York 11201.

59.     Upon information and belief, Opportunity Partners LP is an Ohio limited partnership with its principal place of business at 60 Heritage Drive, Pleasantville, New York, New York 10570.

60.     Upon information and belief, defendant Paper Products, Miscellaneous Chauffeurs, Warehousemen, Helpers, Messengers, Production and Office Workers Local 27 Pension Fund, by and through its Board of Trustees, is a multi-employer defined benefit plan established pursuant to a written trust agreement and administered by its Board of Trustees, with its principal place of business at 45-18 Court Square, 6th Floor, Long Island City, New York 11101.

61.     Upon information and belief, defendant Pavers and Road Builders District Council Pension Fund, by and through its Board of Trustees, is a multiemployer defined benefit pension plan, with its principal place of business at 136-25 37th Avenue, Flushing, New York 11354-4167.

62.     Upon information and belief, defendant Quantitative Master Series LLC f/k/a Quantitative Master Series Trust is a Delaware limited liability company and a no-load, open-end investment company registered under the Investment Company Act of 1940, with its principal place of business in Wilmington, Delaware and additional offices in New York, New York, including the office of its Chief Executive Officer at 55 East 52nd Street, New York, New York 10055.  Upon information and belief, Quantitative Master Series LLC maintains certain series (and issues shares of beneficial interest in such series) that legally or beneficially owned Tribune common stock purchased, repurchased, or redeemed by Tribune in connection with the LBO or received proceeds of the Shareholder Transfers, including at least the following series: Master S&P 500 Index Series.

63.     Upon information and belief, defendant RBC Capital Markets, LLC f/k/a RBC Capital Markets Corporation is a Minnesota limited liability company with its principal place of business in Minneapolis, Minnesota and additional offices at 3 World Financial Center, 200 Vesey Street, New York, New York 10281.

64.     Upon information and belief, defendant Reform Pension Board Trust, by and through its Board of Trustees, is a defined contribution, multi-employer "church plan" as defined under IRS § 403(b) regulations, with its principal place of business at 355 Lexington Avenue, 18th Floor, New York, New York 10017.

65.     Upon information and belief, defendant Scotia Capital Inc. is an Ontario corporation with its principal place of business in Toronto, Ontario.  Upon information and belief, Scotia Capital Inc. conducts substantial and continuous business in, and derives substantial revenue from, this State, including but not limited to with and from, among others, its

subsidiary Scotia Capital (U.S.A.) Inc., which is headquartered at One Liberty Plaza, 26th Floor, New York, New York 10006.

66.     Upon information and belief, defendant State Street Bank and Trust Company, as trustee of The Consolidated Edison Retirement Plan, is a Massachusetts trust company with its principal place of business at One Lincoln Street, Boston, Massachusetts 02111.  Upon information and belief, State Street Bank and Trust Company conducts substantial and continuous business activities in this State, both through its trusteeship of the plan and otherwise, and maintains offices in New York, New York.

67.     Upon information and belief, Stichting Pensioenfonds Campina is a Dutch pension fund (for retired employees of FrieslandCampina Werknemers B.V.) with its principal place of business at Houttuinlaan 4, 3447 GM Woerden, The Netherlands.  Upon information and belief, Stichting Pensioenfonds Campina regularly transacts substantial business in this State.

68.     Upon information and belief, defendant Tax Managed Opportunity Fund, LLC is a Delaware limited liability company registered to do business in this State.

69.     Upon information and belief, defendant TE Calel Portfolio, Ltd. is a Cayman Islands exempted company with a registered address in George Town, Grand Cayman and doing business at 200 West Street, New York, New York 10282.

70.     Upon information and belief, defendant The Bank of New York Mellon, as trustee of the Citigroup Pension Plan Trust, is a New York-chartered bank with its principal place of business at One Wall Street, New York, New York 10286.

71.     Upon information and belief, defendant The Church Pension Fund, in its individual and trustee capacities, is a corporation chartered in 1914 by the Legislature of the State of New York to establish the clergy pension system of the Episcopal Church and has its principal place of business at 445 Fifth Avenue, New York, New York 10016.  The fund is the sponsor and administrator of the fund's Clergy Pension Plan, The Episcopal Church Lay Employees' Retirement Plan, and The Staff Retirement Plan of The Church Pension Fund.  The fund maintains a master trust, of which it is the trustee, with an undivided ownership interest in the portion of the fund's assets allocable to the foregoing plans.

72.     Upon information and belief, defendant The Consolidated Edison Retirement Plan is a defined benefit, noncontributory pension plan sponsored by Consolidated Edison Company of New York, Inc., which provides benefits to retired employees of the sponsor, including retirees in this State.  Upon information and belief, the plan's administrative office is at 4 Irving Place, 15th Floor South, New York, New York 10003.

73.     Upon information and belief, defendant The Dreyfus Corporation is a New York corporation with its principal place of business at 200 Park Avenue, New York, New York 10166.

74.     Upon information and belief, defendant The Northern Trust Company, as trustee of the Master Trust Between Pfizer Inc. and The Northern Trust Company (as successor to Wyeth Master Trust) is an Illinois banking corporation with its principal place of business in Chicago, Illinois.  Upon information and belief, Wyeth Master Trust was a master trust investment account, with The Northern Trust Company as trustee, which master trust investment account held the assets of the Wyeth Retirement Plan – U.S., a non-contributory defined benefit

pension plan sponsored by Pfizer Inc., as the acquirer of the plan's original sponsor, Wyeth. Upon information and belief, in 2010, the Wyeth Retirement Plan was merged with and into the Pfizer Consolidated Pension Plan, a defined benefit pension plan sponsored by Pfizer Inc., and concomitantly, the net assets of the Wyeth Master Trust were transferred to the Master Trust Between Pfizer Inc. and The Northern Trust Company, a master trust investment account with defendant The Northern Trust Company as trustee.   Upon information and belief, The Northern Trust Company continuously and systematically conducts substantial business in this State, has registered a domestic representative office with the New York State Department of Financial Services, and is subject to regulation thereby.

75.     Upon information and belief, defendant The Northern Trust Company, in its capacity as trustee of The Reader's Digest Association, Inc. Retirement Plan, is an Illinois banking corporation with its principal place of business in Chicago, Illinois.  Upon information and belief, The Northern Trust Company continuously and systematically conducts substantial business in this State, has registered a domestic representative office with the New York State Department of Financial Services, and is subject to regulation thereby.

76.     Upon information and belief, defendant The Reader's Digest Association, Inc. Retirement Plan is single-employer, defined benefit plan, with its administrator's office at 750 Third Avenue, 4th Floor, New York, New York 10017.  The plan is sponsored by The Reader's Digest Association, Inc., a New York corporation with its principal place of business at the same address, and provides benefits to the retired employees thereof, including in this State.

77.     Upon information and belief, defendant The Teachers' Retirement System of the City of New York, by and through The Teachers' Retirement Board, is a pension fund

established under New York law and administered by The Teachers' Retirement Board, with its

principal place of business at 55 Water Street, New York, New York 10041.  Under Section 13-

507 of the Administrative Code of the City of New York, The Teachers' Retirement Board is

endowed with the attributes of a corporation.

78.     Upon information and belief, Tompkins Financial Corporation f/k/a

Tompkins TrustCo, Inc. is a New York corporation with its principal place of business at

121 East Seneca Street, Ithaca, New York 14850.

79.     Upon information and belief, defendant United Teamsters Pension Fund

"A," by and through its Board of Trustees, is a multi-employer defined benefit pension plan with

its principal place of business at 2137-2147 Utica Avenue, Brooklyn, New York 11234.  United

Teamsters Pension Fund "A" maintains a trust fund to provide pension benefits to participating

members of the Produce Purveyors, Fresh & Frozen Fruits and Vegetables, Processed Fish

Drivers, Helpers, Salesmen and Warehousemen Local Union No. 202 of the International

Brother of Teamsters, Chauffeurs, Warehousemen and Helpers of America.  Upon information

and belief, the Board of Trustees is the trustee of the trust fund and has been designated as the

agent for service of process on United Teamsters Pension Fund "A."

80.     Each of the foregoing defendants (collectively, the "**Shareholder**

**Defendants**"):

(a)     either– (i) was a legal or beneficial owner of Tribune's common

stock that was purchased, repurchased, or redeemed by Tribune in connection

with the LBO, or (ii) received proceeds of the Shareholder Transfers; and

27

(b)      either is– (i) a natural person who resides in or is domiciled in this

State, (ii) a juridical entity that is incorporated, organized, established,

headquartered, or conducts or is licensed to conduct business within this State, or

(iii) a natural person or juridical entity that, upon information or belief, in person

or through an agent or affiliate, transacts business within this State or contracts to

supply goods or services in this State, regularly transacts or solicits business in

this State, derives substantial revenue from goods used or services rendered in this

State, derives substantial revenue from interstate or international commerce,

maintains relations to or engages in any other persistent course of conduct in this

State, or owns, uses or possess real property situated in this State, sufficient to

afford a basis for the exercise of personal jurisdiction.

Exhibit A appended hereto and incorporated herein, includes, upon information and belief, each

Shareholder Defendant's last known address as well as the dates and the dollar amounts of

proceeds of Shareholder Transfers received by such defendant.  To comply with a protective

order entered by the Bankruptcy Court, Plaintiffs have redacted certain information from

Exhibit A.  Plaintiffs will file an unredacted version of Exhibit A under seal with the permission

of this Court.

## JURISDICTION AND VENUE

81.     This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1334(b) and 12 U.S.C. § 632 (the "Edge Act").

82.     Pursuant to 28 U.S.C. § 1334(b), this Court has original subject matter

jurisdiction over this action because it is "related to" the jointly administered Tribune bankruptcy

cases currently pending in the Bankruptcy Court insofar as, among other things:  (a) this action was commenced pursuant to the Standing Order issued by the Bankruptcy Court; (b) the Bankruptcy Court has retained jurisdiction to hear and decide disputes relating to or arising from the Standing Order; and (c) a judgment in favor of Plaintiffs in this action, which provides them with an additional source of recovery, may affect the ultimate distributions Plaintiffs are entitled to receive on account of their allowed claims from (i) the Tribune bankruptcy estates and (ii) litigation trusts to be established under any confirmed plan of reorganization.

83.     The Edge Act provides that district courts of the United States have original jurisdiction over "all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking . . . or out of other international or foreign financial operations."  12 U.S.C. § 632.

84.     Pursuant to the Edge Act, this Court has original subject matter jurisdiction over this action because (a) at least two of the Shareholder Defendants, Bank of America, N.A. and BlackRock Institutional Trust Company, N.A. f/k/a Barclays Global Investors, N.A., are national banking associations, which are corporations organized under the laws of the United States; and (b) this action arises out of transactions that involve international or foreign banking or international or foreign financial operations.  More specifically, the distribution of approximately $8.3 billion to Tribune's former shareholders in the LBO, including distributions to the Shareholder Defendants, was funded with loans provided by a syndicate of United States and foreign banks, including Barclays Bank plc of the United Kingdom and Sumitomo Mitsui Banking Corp. of Japan.  Further, hundreds of millions of

dollars in Shareholder Transfers were made from the United States to recipients in dozens of foreign countries, including Austria, Canada, France, Germany, Japan, Luxembourg, the Netherlands, Switzerland, and the United Kingdom (and its overseas territories), including in this action Shareholder Defendants Deephaven Event Trading Ltd. (Cayman Islands), Deephaven Growth Opportunities Trading Ltd. (British Virgin Islands), Scotia Bank Inc. (Canada), Stichting Pensioenfonds Campina (The Netherlands), and TE Calel Portfolio, Ltd. (Cayman Islands).

85.    Pursuant to Fed. R. Civ. P. 4(k)(1)(A) and N.Y. C.P.L.R. § 301 or 302, this Court has personal jurisdiction over each of the Shareholder Defendants to the extent that a Shareholder Defendant is (a) a natural person who resides in or is domiciled in this State; (b) a juridical entity that is incorporated, organized, established, headquartered, or conducts or is licensed to conduct business within this State; or (c) a natural person or juridical entity that, in person or through an agent or affiliate, regularly transacts or solicits business in this State, derives substantial revenue from goods used or services rendered in this State, expects or should reasonably have suspected the Shareholder Transfers to have had consequences in this State, derives substantial revenue from interstate or international commerce, or maintains relations to or engages in any other persistent course of conduct in this State sufficient to afford a basis for the exercise of personal jurisdiction.

86.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of the property that is the subject of the action is located, in this District.

## FACTUAL BACKGROUND

### I.    The Company's Business and Historical Performance

87.    Founded in 1847, Tribune reaches more than 80% of U.S. households through its newspapers and other publications, its television and radio broadcast stations and cable channels, and its other entertainment offerings.  Headquartered in Chicago, Illinois, Tribune's operations are conducted through two primary business segments.  Tribune's publishing segment owns major newspapers in many of the most significant markets in the United States, including the Chicago Tribune, the Los Angeles Times, the Baltimore Sun, the South Florida Sun-Sentinel, the Orlando Sentinel, and Newsday.  Tribune's broadcasting and entertainment segment owns numerous radio and television stations in major markets.

### II.    The Company's Financial Condition Deteriorates and the Shareholders Begin Agitating for Change.

88.    In June 2000, Tribune merged with Times Mirror, which was owned by the Chandler family.  As a result of this merger, the Chandler family, through Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "**Chandler Trusts**"), became Tribune's second largest shareholder and was awarded three seats on the Tribune Board.

89.    The market did not react well to the merger with Times Mirror and, over the course of the next few years, the Company experienced a steady decline in revenues, profitability, and its stock price.  In response, Tribune took repeated steps to reduce costs by liquidating assets and shedding jobs.  But the numbers continued to drop.  By 2006, the Company's profitability was exhibiting quarter-over-quarter declines compared to both 2004 and the majority of 2005.

31

90.     In or about February 2006, the Chandler Trusts' patience ran out and they began to complain about the Company's performance and to criticize the Tribune Board.  The Chandler Trusts admonished the Tribune Board that, absent an upturn in Tribune's stock price, the Chandler Trusts would themselves begin exploring a "fundamental transaction" involving Tribune.

91.     In May 2006, the Tribune Board decided to engage in a leveraged recapitalization pursuant to which it would borrow money to repurchase up to 75 million shares of its common stock.  The Chandler Trusts' three representatives on the Tribune Board, however, voted against the transaction.

92.     In a publicly filed letter to the Tribune Board on June 13, 2006, the Chandler Trusts advised that they would not participate in the planned repurchase.  The Chandler Trusts complained that "[o]ver the past two years, Tribune has significantly underperformed industry averages and there is scant evidence to suggest the next two years will be any different." The Chandler Trusts explained that "[t]he gravity of management's failure to address fundamental strategic issues is apparent from the precipitous decline in stock value over the past three and a half years. . . . [S]ince the beginning of 2003 (when current management of Tribune was put into place), the value of Tribune's stock has declined over 38% — substantially worse than both the newspaper peer group (down 8.8%) and the broadcasting peer group (down 29%)." The Chandler Trusts added that "it is the time for prompt, comprehensive action."

93.     On June 27, 2006, Tribune nonetheless announced that it had elected to proceed with the repurchase of 55 million shares through a public tender offer and a private transaction (the "**2006 Repurchase**") with the Robert R. McCormick Tribune Foundation and

the Cantigny Foundation (collectively, the "**Foundations**" and, together with the Chandler

Trusts, the "**Large Shareholders**") at a cost of nearly $1.8 billion which was financed with debt.

As a result of the 2006 Repurchase, the Chandler Trusts became Tribune's largest stockholders

and the Foundations continued to be major shareholders.

94.     Unfortunately, the 2006 Repurchase failed to raise Tribune's stock price.

To make matters worse, as a result of the 2006 Repurchase, the Company's debt materially

increased by almost 50% and Moody's Investors Service cut Tribune's bond rating to "junk"

status.

95.     After the failed 2006 Repurchase, the Large Shareholders redoubled their

efforts to effect change at Tribune.  Because of the Chandler Trusts' publicly expressed

discontent and their increasing pressure on management, in September 2006, the Tribune Board

announced that it had established a special committee to oversee management's exploration of

transactions that might maximize the value of Tribune stock.

**III.     The LBO Is Proposed and Approved.**

96.     In late January 2007, billionaire investor Zell emerged as a potential buyer

for Tribune.  Before Zell's emergence on the scene, the Tribune Board had been considering

transactional alternatives to placate the Large Shareholders, including a possible sale of the entire

Company or select assets, as well as an internal recapitalization.

97.     Zell proposed a wholly new option.  On or about February 6, 2007, Zell

wrote to the Tribune Board and proposed to acquire Tribune in an LBO transaction.

98.     Under Zell's proposal, the Company would borrow nearly $11 billion —

while Zell would invest just $315 million of his own money — to buy out the Shareholders.  In

other words, Zell sought to acquire the Company by putting up less than 3% of the risk capital and shifting all of the risk of the transaction onto the shoulders of the Company's existing creditors.

99.     On March 10, 2007, management informed Zell that it was skeptical of proceeding with his LBO proposal because of its high degree of leverage.  Only a week before the LBO was announced, a senior Tribune officer wrote to Tribune's treasurer after reviewing financial projections: "[I]f I am reading this right, we have a pretty narrow band for success under the [deal]–i.e., if we are off plan by 2% we have no value in the ESOP for 5 years."  The treasurer responded and confirmed: "yes, if we hit the down 2 case there is no equity value in the first 5 yrs."

100.    However, the prospect of obtaining a windfall for themselves and the Shareholders was too hard to resist.  Management dismissed the concerns over the Company's financial future and approved the LBO on April l, 2007.

101.    The merger agreement contemplated a single transaction in two steps.  In connection with Step One, Tribune would purchase 52% of Tribune's common stock in a tender offer at the premium price of $34 per share.  In connection with Step Two, Tribune would purchase all of the remaining Tribune common stock at the same premium price of $34 per share in a merger that would ultimately take Tribune private.  To finance the deal, the Company committed to borrow nearly $11 billion — more than $8.2 billion of which was funneled to the Shareholders as Shareholder Transfers.  The remainder of the loan proceeds was used to pay lender and advisor fees, transaction costs and expenses, and to refinance the debt incurred in connection with the 2006 Repurchase.

102.    Notwithstanding its two-step structure, the LBO was conceived, promoted, and proceeded as (and, in economic reality, was) an integrated transaction in which neither Step One nor Step Two was intended to occur on its own.  In fact, had there been a way to structure the LBO so that only a single step were necessary, the LBO would have been structured accordingly.

103.    The Tribune Board approved both Step One and Step Two at the same time, and promoted the LBO as a single transaction, indicating that management intended both steps to constitute one integrated transaction.  For example, on April 2, 2007, Tribune publicly announced that it had agreed to the Zell proposal.  Tribune's press release stated, in pertinent part:

> With the completion of its strategic review process, Tribune Company today announced a transaction which will result in the company going private and Tribune shareholders receiving $34 per share.  Sam Zell is supporting the transaction with a $315 million investment.  Shareholders will receive their consideration in a two-stage transaction.
>
> Upon completion of the transaction, the company will be privately held, with an Employee Stock Ownership Plan ('ESOP') holding all of Tribune's then outstanding common stock and Zell holding a subordinated note and a warrant entitling him to acquire 40 percent of Tribune's common stock.  Zell will join the Tribune board upon completion of his initial investment and will become chairman when the merger closes.
>
> The first stage of the transaction is a cash tender offer for approximately 126 million shares at $34 per share.  The tender offer will be funded by incremental borrowings and a $250 million investment from Sam Zell . . . .
>
> The second stage is a merger expected to close in the fourth quarter of 2007 in which the remaining publicly-held shares will receive $34 per share.  Zell will make an additional investment of

$65 million in connection with the merger, bringing his investment
in Tribune to $315 million.

104.    The primary structural mechanism used to execute the LBO was created
for the sole purpose of generating certain tax benefits.  Those benefits, however, could only be
realized upon consummation of Step Two.  Thus, the LBO made economic sense only if Step
Two closed and the anticipated tax savings could be realized.

105.    The lenders that financed the LBO analyzed Step One and Step Two
concurrently, and the commitment letters for both steps of the transaction were executed at the
same time, cross-referenced each other, and obligated the lenders to provide financing for Step
One and Step Two.  Moreover, the same exact lenders financed both steps of the LBO pursuant
to a single credit agreement that interlocked the financing of both steps with a loss-sharing
provision and based the fees and interest rate associated with the Step One loans upon the
Company's debt load following Step Two.  On March 28, 2007, Tribune's treasurer instructed
that a draft press release should state that "Tribune has received committed financing from
Citigroup, Merrill Lynch and JPMorgan sufficient to complete both steps of the transaction."

106.    As was widely acknowledged by all of the parties involved, shareholder
approval for the LBO was virtually guaranteed from the LBO's inception as a result of a voting
agreement with the Chandler Trusts.  Indeed, after Tribune purchased half of its outstanding
common stock in connection with Step One, nearly half of the remaining shares were held by the
Large Shareholders and others directly under Zell's control.

107.    At Tribune's shareholder meeting on August 21, 2007, almost 65% of
Tribune's common stock outstanding (and 97% of the shares that were voted) approved Step

Two.  In the press release announcing the results of the shareholder vote, Tribune's former Chairman and CEO was quoted as saying, "With financing fully committed, we anticipate closing the transaction in the fourth quarter, following FCC approval and satisfaction of the other closing conditions."

108.    The parties and industry experts also believed that the LBO would obtain regulatory approval from the FCC, one of the closing conditions.  As recognized by rating agencies and news analysts, FCC approval in these circumstances was expected.  On May 3, 2007, for example, Fitch Ratings reported its view that the necessary regulatory approvals associated with Step Two would be obtained.

## IV.   The Disastrous Consequences of the LBO Were Foreseeable (and Foreseen).

109.    The Shareholders approved the LBO — and reaped the financial benefits of the Shareholder Transfers — even though they knew, should have known, or had reason to know that it would render Tribune insolvent, inadequately capitalized, or unable to satisfy its obligations.  Indeed, as made clear by a cascade of contemporaneous news reports and ratings downgrades, the generally unfavorable reaction to the LBO came swiftly and loudly.

110.    On April 3, 2007 — just one day after the deal was announced — a Goldman Sachs analyst reported that "with estimated annual interest expense of over $1bn/yr and estimated EBITDA of $1.3bn, the transaction leaves little room for error, particularly in this challenging newspaper operating environment."  The analyst pointed out that the LBO's high leverage left Tribune in a "precarious financial position."

111.    A Lehman Brothers analyst reported on April 26, 2007 that the "[p]roposed deal leaves TRB with debt-to-2007E-EBITDA of 11.5x . . . which we believe is far

too high for secularly declining businesses. . . .  Debt payments should overwhelm EBITDA, by our calculations."

112.    On March 16, 2007, that same Lehman Brothers analyst warned that "putting this much debt on Tribune's newspapers and TV stations is way too risky and makes it very possible to put the company into bankruptcy with or without the added tax savings" that Zell anticipated.

113.    On March 29, 2007, Standard & Poor's had a similar prediction and sent a letter to Tribune's treasurer, stating that it would downgrade Tribune's credit rating because "the company is expected to default in 2009 when its cash flow and revolving credit capacity are unable to cover its interest expense, capital expenditures, and working capital needs."

114.    On August 14, 2007, a Lehman Brothers analyst once again warned:

> [W]e continue to think the probability of significant financial difficulty at Tribune is much, much greater than 50%/50% — given the secularly declining fundamentals and the large amount of leverage involved which is currently at 9.6 times 2008E EBITDA and would rise to nearly 12 times if the second tranche occurs. . . . So by our calculations, if the second tranche of the privatization deal happens, the company will not be able to cover the estimated annual interest expense from operations let alone have excess free cash flow to pay down debt each year.

The analyst's cautionary warnings, of course, proved accurate.

115.    Spooked by the enormous leverage being foisted upon the Company in connection with the LBO, all of the major rating agencies consistently and continuously downgraded Tribune's debt ratings — ultimately to "junk" or "near junk" status — on nearly a dozen occasions from the time the deal was announced until Tribune filed for bankruptcy.

116.    Financial analysts and rating agencies were not alone in recognizing the devastating consequences of the proposed LBO.  As soon as the LBO was announced, a growing chorus of news outlets also began reporting the substantial risk of the proposed transaction, openly questioned the proposal's soundness, and highlighted the crushing debtload that the LBO would create.

117.    For example, on April 2, 2007, the Baltimore Sun — one of Tribune's own newspapers — questioned the wisdom of the proposed LBO: "The deal, which would return Tribune to private ownership, would make the company one of the most heavily indebted enterprises in the media industry at a time of falling readership and declining advertising revenues."  Tribune's rivals were "dumbfounded" by the deal, observed the reporter.

118.    On April 3, 2007, Bloomberg News quoted an industry analyst who stated that, for the LBO to succeed, Tribune either had to significantly cut costs or experience "significant growth."  The analyst remarked that "There just isn't a scenario that shows how this industry or this company is going to get significantly better."  The article essentially predicted that, absent a miracle, Tribune could not survive the LBO.

119.    The very same day, The New York Times reported that the proposed sale came with some "big risks," observing that the LBO "would saddle the company with $13 billion in debt even as advertising sales and circulation decline."

120.    In an April 4, 2007 article entitled "How Will Tribune Pay Its Debts?" the Wall Street Journal quoted a Barclays Capital analyst who indicated that "We think it is possible that Tribune is leveraged higher than the total assets of the company after taxes."

121.    On April 6, 2007, The New York Times characterized the proposed LBO as "one of the most absurd deals ever."

122.    On April 16, 2007, Businessweek also raised serious concerns as to the highly leveraged nature of the proposed LBO:

> How leveraged?  The just-announced deal orchestrated by investor Sam Zell leaves the company with more than $13 billion in debt. To put that in its proper perspective, Tribune's cash flow in '06—earnings before interest, taxes, depreciation, and amortization, or EBITDA—was $1.3 billion.  Thus its debt exceeds last year's EBITDA by about ten times.  This is an angina-inducing multiple even for veteran media players accustomed to playing with debt, some of whom get nervous above six.  And Tribune's cash flow comes in large part from big-city Old Media properties, which are not noted for their stability right now.  (Tribune's revenues declined by more than 5% in February.)

123.    On December 3, 2007, Barron's echoed this concern, reporting that "[t]he combination of a weakening economy and heavy debt loads is causing trouble for many companies that went private in leveraged buyouts since the start of 2006."  While noting the general increase in risk of LBOs, Barron's called-out Tribune in particular:  "One pending LBO that could be a financial disaster is Tribune (TRB)."

124.    Financial-market participants also recognized, almost immediately, that Tribune inevitably would crumble under the weight of the debtload imposed by the LBO.  Prices for Tribune credit-default swaps ("**CDS**"), a form of "insurance" that would pay out if Tribune defaulted on its obligations, skyrocketed on the day the LBO was announced and continued to soar through the close of Step Two.

125.    A June 7, 2007 Bloomberg News article chronicled the ever-increasing price of a Tribune CDS, and the ever-increasing risk of the LBO to Tribune's creditors:

> Leveraged buyouts are financed by adding debt onto the target
> company, increasing the risk that existing bonds and loans may not
> be repaid.  In Tribune's case, the perceived risk of owning its 5-
> year bonds tripled after Zell's buyout was reported, based on
> credit-default swap prices.

126.    On July 20, 2007, Bloomberg News reiterated what the climbing CDS

price indicated in terms of Tribune's chances of survival after the LBO:

> Tribune Co. has a 50-50 chance of missing interest payments on
> some of the $13 billion in debt it will have after real estate investor
> Sam Zell buys the company, trading in the company's credit-
> default swaps shows.
>
> Prices of the swaps, financial contracts used to speculate on a
> company's ability to repay debt, have jumped $331,000 since the
> first step in the sale was completed in May.  It costs $770,000 to
> protect $10 million of Tribune bonds for five years, according to
> CMA Datavision, indicating a more than 50 percent risk of default.
> That's up from 32 percent on May 24, based on a JPMorgan Chase
> & Co. pricing model.

The article went on to explain that "Tribune swaps prices imply investors consider the company

the fourth-riskiest debt issuer among the almost 1,200 worldwide whose credit-default swaps

were quoted this week by London-based CMA."

127.    Although the risks to the Company's creditors were apparent, the

Shareholders overwhelmingly supported the LBO: 92% of Tribune's stock was tendered at Step

One, and 97% percent of voting Shareholders voted in favor of Step Two.  An August 21, 2007

article in Medill Reports quoted one Tribune shareholder who succinctly summarized the

Shareholders' rationale for approving the deal: "If you're making money on [the deal], sure,

what the hell."

**V.      The Company's Financial Impairment and Flawed Solvency Opinions.**

128.    Because of the Company's moribund financial prospects and the extraordinarily leveraged nature of the LBO, one of the closing conditions — securing viable solvency opinions in connection with both Step One and Step Two — was poised to jeopardize the deal.  And finding a firm to provide the requisite opinions turned out to be no easy task.  Indeed, Valuation Research Corporation ("**VRC**"), the financial advisory firm that ultimately provided Tribune with the necessary solvency opinions, was the last-ditch choice for Tribune after other firms declined the engagement.

129.    Tribune first approached Houlihan Lokey Howard & Zukin ("**Houlihan**"), a prominent solvency opinion firm.  Houlihan, however, expressed serious reservations regarding its ability to provide a solvency opinion in connection with such a highly leveraged transaction and declined even to accept the engagement.  Tribune scrambled to find another firm that might provide the necessary opinions.

130.    VRC was aware of Houlihan's reservations about the proposed LBO and recognized that Houlihan's reluctance raised the risk profile associated with the project.  Due to the risk attached to the highly leveraged deal, and Houlihan's disinclination to get involved, VRC was able to demand among the highest fees VRC had ever received for solvency opinion work.  In exchange, VRC provided the Tribune Board with: (a) written opinions, dated May 9, 2007, and May 24, 2007, as to the solvency and capital adequacy of the Company after giving effect to Step One; and (b) a written opinion, dated December 20, 2007, as to the solvency and capital adequacy of the Company after giving effect to Step Two.

131.    Two uncommon aspects of VRC's engagement are noteworthy.  First, VRC was instructed to ignore the generally accepted definition of "fair value" and, instead, to measure fair value in relation to a willing buyer and a willing seller <u>both of whom receive the favorable federal income tax treatment of the ESOP</u>.  As a result of this built-in limitation, VRC never offered any opinion as to whether Tribune or the Company would be solvent if it were to be acquired by an entity that did not receive the uniquely favorable federal income tax treatment.  Second, VRC was excused from the typical obligation to affirmatively investigate and skeptically evaluate any information provided by management.  Consequently, VRC never independently assessed the (un)reasonableness of management's unjustifiably optimistic projections upon which all of VRC's solvency opinions were based.

**(A)**    <u>**Step One**</u>

132.    VRC's Step One solvency analysis in May 2007 was based upon financial projections that were finalized by management and approved by the Tribune Board in February 2007 (the "<u>**February Projections**</u>").

133.    The February Projections were substantially higher than the Company's actual operating results.  For the three months from March through May 2007, publishing revenues and earnings were below plan by $50.6 million and $29.7 million, respectively.  During the same period, broadcasting revenues and earnings were below plan by $9.4 million and $4.6 million, respectively.

134.    Management, who received weekly "flash reports," was fully aware that the February Projections were outdated and unreliable almost immediately after they were

finalized and approved.  Despite this awareness, management persistently declined to revise and update the February Projections until long after Step One had closed.

135.     As a result of the foregoing, the February Projections were unreasonable and unreliable.  Notwithstanding management's acknowledgements that the Company's actual results were lagging the February Projections, those projections were not updated before VRC's Step One solvency opinions were issued.  In fact, management failed to provide any updated financial projections to VRC until late September 2007.

136.     The solvency opinions provided by VRC at Step One were substantially flawed and unreliable for a number of reasons, including but not limited to:

(a)     VRC blindly used the outdated, unreasonable, and unwarranted February Projections supplied by management without any critical analysis.

(b)     VRC artificially separated the two steps of the LBO for purposes of its Step One solvency analysis despite the fact that the LBO was conceived of and promoted as a single, integrated transaction for which financing was fully committed.

(c)     VRC improperly modified the conventional definition of "fair market value" to mean that a "fair market" buyer would be structured to receive the same favorable tax treatment as the ESOP in connection with the LBO.

(d)     VRC inappropriately reduced the weight given to its discounted cash flow analysis and increased the weight given to its higher comparable transactions analysis to increase Tribune's overall valuation.

(e)     VRC incorrectly assumed that Tribune would be able to refinance its debts as they matured.

137.    As of June 4, 2007, the correct fair market value of the Company's assets was approximately $10.99 billion.  Tribune had obligated itself to consummate an LBO that would saddle it with debt and contingent liabilities of approximately $14.03 billion.  As a consequence, and as of the closing of Step One, the Company was insolvent to the extent of approximately $3.04 billion.

138.    Of course, the Company had been highly leveraged in comparison to its peers even before the LBO.  After Step One, however, its debt-to-EBITDA ratio further skyrocketed to 11.4 — more than six times that of its most highly leveraged competitor, and more than eight times that of the industry average.  The Company's debt-to-equity ratio (book value) plummeted below zero, to a ratio of approximately negative 3.5.

139.    The Company could not service the significant amount of leverage imposed by the LBO and lacked adequate capital liquidity to operate its business following Step One.  The Company had an interest-coverage ratio of 1:1, the lowest among its peers, and was unlikely to be able to cover its interest expense.  The Company's operating cash flows were also insufficient to meet its debt service obligations.

140.    Following Step One, the Company had insufficient capital resources to fund its operations and service its debt while maintaining an adequate cushion for reasonably foreseeable stresses, downturns, and contingencies.

**(B)      Step Two**

141.    VRC's Step Two solvency analysis exhibited many of the same flaws and skewed assumptions as VRC's Step One solvency analysis, including VRC's novel and improper

definition of "fair market value" and the inappropriate weighting that VRC assigned to its different valuation methodologies.

142.    In addition, VRC's Step Two solvency analysis in December 2007 was based upon unreasonable and unreliable financial projections that were updated by management and presented, in part, to the Tribune Board in October 2007 (the "**October Projections**").

143.    The October Projections were, to some degree and in the near-term, downward revisions of the February Projections.  However, despite the continued deterioration of the Company's performance after Step One closed, certain critical forecasts in the October Projections were dramatically revised upward from the February Projections.

144.    For example, the October Projections assumed that, as early as 2009, Tribune's internet-based business would generate significantly greater revenues than anticipated in the February Projections and, thereby, mitigate the continuing decline in Tribune's traditional publishing business.  Yet, the internet-based business had already failed to meet management expectations in 2007.

145.    The October Projections also forecasted that, beginning in 2013 and accelerating through 2017, the Company's revenue would significantly outperform the February Projections on a consolidated basis.  It was patently unreasonable, however, for the Company to assume that each of the five years following the 2012 election year would also enjoy the benefit of the bump in revenue occasioned by swells of political advertising.

146.    As a result of the foregoing, the October Projections were unreasonable and unreliable.  Nonetheless, VRC indiscriminately relied upon the October Projections when preparing its Step Two solvency opinion.

147.   As of December 20, 2007, the correct fair market value of the Company's assets was approximately $10.44 billion.  The Company's debt and contingent liabilities totaled approximately $13.76 billion.  As a consequence, as of the closing of Step Two, the Company was insolvent to the extent of approximately $3.32 billion.

148.   Following Step Two, the Company was excessively leveraged, experiencing a debt-to-EBITDA ratio that was nearly double that of its closest peer, and more than eight times higher than the average of its other peers.  In addition, the Company was the only one of its peers that had a negative debt-to-equity ratio, and had the lowest interest-coverage ratio among its peers.

## VI.   <u>The Aftermath of the LBO</u>

149.   Because of the LBO, Tribune's funded debtload soared from more than $5 billion to nearly $14 billion — ten times greater than the Company's actual cash flow for 2006 or projected cash flow for 2007.

150.   As was widely predicted by a cacophony of financial analysts, industry experts, rating agencies, market participants, and media outlets alike, the Company's financial health deteriorated rapidly after the LBO closed.  On July 14, 2008, for example, the Associated Press reported that the Los Angeles Times planned to cut 250 positions because the Company was "struggling to service th[e] debt" taken on in connection with the LBO.  None of Tribune's cost-cutting measures, however, could forestall the inevitable.

151.   Buried in debt, and facing a bleak future of looming debt maturities and overwhelming interest payments, Tribune and its most valuable operating subsidiaries jointly filed for bankruptcy on December 8, 2008.

152.     Tribune's own publicly filed estimates in the Bankruptcy Court valued the Company at approximately $6.1 billion in 2010 — less than half of the Company's debt load at the close of Step Two.

153.     The Pre-LBO Noteholders have yet to receive payments on the Pre-LBO Noteholder Claims; and under the two plans of reorganization currently being considered before the Bankruptcy Court, the Pre-LBO Noteholders would receive initial distributions of only a small fraction of the money they are owed.

## COUNT I

**(Constructive Fraudulent Transfer
Against the Shareholder Defendants
Pursuant to N.Y. Debt. & Cred. Law §§ 273, 278 & 279)**

154.     Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

155.     On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

156.     On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

157.     Tribune did not receive, and none of the Shareholder Defendants gave, fair consideration in exchange for the Shareholder Transfers.

158.     At the time the Shareholder Transfers were made or as a result of making the Shareholder Transfers, the present fair salable value of Tribune's assets was less than the

amount that would have been required to pay Tribune's probable liabilities on its existing debts as they became absolute and matured.

159.     Accordingly, the Shareholder Transfers should be set aside and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT II

### (Constructive Fraudulent Transfer
### Against the Shareholder Defendants
### Pursuant to N.Y. DEBT. & CRED. LAW §§ 274, 278, & 279)

160.     Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

161.     On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

162.     On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

163.     Tribune did not receive, and none of the Shareholder Defendants gave, fair consideration in exchange for the Shareholder Transfers.

164.     At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which the property remaining with Tribune after making the Shareholder Transfers was an unreasonably small capital.

165.     Accordingly, the Shareholder Transfers should be set aside and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT III

**(Constructive Fraudulent Transfer
Against the Shareholder Defendants
Pursuant to N.Y. DEBT. & CRED. LAW §§ 275, 278, & 279)**

166.     Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

167.     On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

168.     On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

169.     Tribune did not receive, and none of the Shareholder Defendants gave, fair consideration in exchange for the Shareholder Transfers.

170.     At the time the Shareholder Transfers were made, Tribune intended or believed that it would incur debts beyond its ability to pay as they matured.

171.     Accordingly, the Shareholder Transfers should be set aside and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT IV

**(Constructive Fraudulent Transfer
Against the Shareholder Defendants
Pursuant to 740 ILL. COMP. STAT. 160/5(a)(2), 160/8, & 160/9)**

172.     Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

173.    On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

174.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

175.    Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

176.    At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which Tribune's remaining assets were unreasonably small in relation to the business or transaction.

177.    At the time the Shareholder Transfers were made, Tribune intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

178.    Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT V

**(Constructive Fraudulent Transfer
Against the Shareholder Defendants
Pursuant to 740 ILL. COMP. STAT. 160/6(a), 160/8, & 160/9)**

179.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

180.    On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

181.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

182.    Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

183.    At the time the Shareholder Transfers were made or as a result of making the Shareholder Transfers, the sum of Tribune's debts was greater than all of Tribune's assets at a fair valuation.

184.    Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## <u>COUNT VI</u>

### (Constructive Fraudulent Transfer
### Against the Shareholder Defendants
### Pursuant to MASS. GEN. LAWS ch. 109A, §§ 5(a)(2), 8, & 9)

185.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

186.    On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

187.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

188.    In connection with Step One and Step Two, each Shareholder who was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune: (a) appointed Computershare Trust Company, N.A. ("Computershare"), located in Braintree, Massachusetts, as such Shareholder's agent and attorney-in-fact to the full extent of its right with respect to such shares; (b) delivered stock certificates and other required documents to Computershare in Massachusetts; and (c) received proceeds of the Shareholder Transfers from Computershare.

189.    Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

190.    At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which Tribune's remaining assets were unreasonably small in relation to the business or transaction.

191.    At the time the Shareholder Transfers were made, Tribune intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

192.    Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT VII

**(Constructive Fraudulent Transfer
Against the Shareholder Defendants,
Pursuant to MASS. GEN. LAWS ch. 109A, §§ 6(a), 8, & 9)**

193.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

194.    On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

195.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

196.    In connection with Step One and Step Two, each Shareholder who was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune: (a) appointed Computershare as such Shareholder's agent and attorney-in-fact to the full extent of its right with respect to such shares; (b) delivered stock certificates and other required documents to Computershare in Massachusetts; and (c) received proceeds of the Shareholder Transfers from Computershare.

197.    Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

198.    At the time the Shareholder Transfers were made, or as a result of making the Shareholder Transfers, the sum of Tribune's debts was greater than all of Tribune's assets, at a fair valuation.

199.    Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## RESERVATION OF RIGHTS

Plaintiffs reserve the right, to the extent permitted by applicable law or by agreement, to assert any claims relating to the subject matter of this action against any third party.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiffs respectfully request that the Court grant the following relief:

(a)    entering a judgment against the Shareholder Defendants, finding that the Shareholder Transfers constitute constructively fraudulent transfers;

(b)    avoiding the Shareholder Transfers to the extent necessary to satisfy the Pre-LBO Noteholder Claims, plus post-petition interest;

(c)    granting recovery of all amounts paid to each of the Shareholder Defendants in connection with the Shareholder Transfers to the extent necessary to satisfy the Pre-LBO Noteholder Claims, plus post-petition interest;

(d)    granting an attachment against the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(e)    imposing a constructive trust on the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(f)     granting an injunction against further disposition of the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(g)     levying execution on the Shareholder Transfers or their proceeds;

(h)     awarding Plaintiffs damages in an amount to be determined at trial;

(i)     awarding Plaintiffs their attorneys' fees, costs, and other expenses incurred in this action;

(j)     awarding Plaintiffs pre- and post-judgment interest at the highest applicable rate; and

(k)     granting such other and further relief as is just and proper.

Dated: New York, New York
       December 19, 2011

FRIEDMAN KAPLAN SEILER
   & ADELMAN LLP

By:     _____
        Robert J. Lack
        Hal Neier
        Amy C. Brown
        Jeffrey C. Fourmaux

        7 Times Square
        New York, NY 10036-6516
        Telephone: (212) 833-1100
        Facsimile:  (212) 833-1250
        rlack@fklaw.com

        *Attorneys for Plaintiffs*

56

# Exhibit A

## EXHIBIT A

| Name | Address | Shareholder Transfers | |
| --- | --- | --- | --- |
| | | Step One | Step Two |
| ALLIANCE CAPITAL GROUP TRUST | c/o ALLIANCEBERNSTEIN L.P. 1345 AVENUE OF THE AMERICAS NEW YORK, NY  10105 | $170,306 | |
| ARCHDIOCESAN PENSION PLAN OF THE ARCHDIOCESE OF NEW YORK | 1011 FIRST AVENUE NEW YORK, NY  10022 | $229,602 | $168,232 |
| BANK OF AMERICA, N.A. (Equity Index Trust) | 100 NORTH TRYON STREET CHARLOTTE, NC  28255 | $1,496,918 | $1,120,470 |
| BANK OF AMERICA, N.A. (Large Cap Value Index Trust of QA Collective Trust Series) | 100 NORTH TRYON STREET CHARLOTTE, NC  28255 | $572,968 | $413,032 |
| BLACKROCK INSTITUTIONAL TRUST COMPANY, N.A. (Equity Index Fund) | 400 HOWARD STREET SAN FRANCISCO, CA 94105 | | $25,008,530 |
| BLACKROCK INSTITUTIONAL TRUST COMPANY, N.A. (Equity Index Fund B) | 400 HOWARD STREET SAN FRANCISCO, CA 94105 | | 1,568,488 |
| BLACKROCK INSTITUTIONAL TRUST COMPANY, N.A. (Equity Index Plus Fund A) | 400 HOWARD STREET SAN FRANCISCO, CA 94105 | | $104,958 |
| BLACKROCK INSTITUTIONAL TRUST COMPANY, N.A. (Equity Value Fund) | 400 HOWARD STREET SAN FRANCISCO, CA 94105 | | $184,470 |
| BLACKROCK INSTITUTIONAL TRUST COMPANY, N.A. (Russell 1000 Alpha Tilts Fund BL) | 400 HOWARD STREET SAN FRANCISCO, CA 94105 | | $225,318 |
| BLACKROCK INSTITUTIONAL TRUST COMPANY, N.A. (Russell 1000 Index Fund) | 400 HOWARD STREET SAN FRANCISCO, CA 94105 | | $4,922,122 |
| BLACKROCK INSTITUTIONAL TRUST COMPANY, N.A. (Russell 1000 Value Fund) | 400 HOWARD STREET SAN FRANCISCO, CA 94105 | | $2,912,066 |
| BLACKROCK INSTITUTIONAL TRUST COMPANY, N.A. (Russell 1000 Value Fund B) | 400 HOWARD STREET SAN FRANCISCO, CA 94105 | | $1,733,864 |

| Name | Address | Shareholder Transfers | |
| --- | --- | --- | --- |
| | | Step One | Step Two |
| BLACKROCK INSTITUTIONAL TRUST COMPANY. N.A. (Russell 2500 Index Fund) | 400 HOWARD STREET SAN FRANCISCO. CA 94105 | | $242.964 |
| BLACKROCK INSTITUTIONAL TRUST COMPANY. N.A. (Russell 3000 Index Fund) | 400 HOWARD STREET SAN FRANCISCO. CA 94105 | | $1.600.550 |
| BLACKROCK INSTITUTIONAL TRUST COMPANY. N.A. (US Equity Market Fund A) | 400 HOWARD STREET SAN FRANCISCO. CA 94105 | | $3.144.442 |
| BLACKROCK INSTITUTIONAL TRUST COMPANY. N.A. (US Equity Market Fund B) | 400 HOWARD STREET SAN FRANCISCO. CA 94105 | | $675.682 |
| BLACKROCK INSTITUTIONAL TRUST COMPANY. N.A. (U.S. Equity Market Sudan Free Equity Index Fund) | 400 HOWARD STREET SAN FRANCISCO. CA 94105 | | $109.922 |
| BLACKROCK VARIABLE SERIES FUNDS. INC. (S&P 500 Index V.I. Fund) | 55 EAST 52ND STREET NEW YORK. NY 10055 ATTN: JOHN M. PERLOWSKI | $95.710 | $70.108 |
| BRICE. DEBORAH L. | ███████████ STATEN ISLAND. NY ████ | $117.742 | |
| CITI CANYON LTD. | c/o MAPLES CORPORATE SERVICES LIMITED UGLAND HOUSE SOUTH CHURCH STREET GEORGE TOWN GRAND CAYMAN KY1-1104 CAYMAN ISLANDS | $173.060 | |
| CITIGROUP PENSION PLAN TRUST | ONE COURT SQUARE 15TH FLOOR LONG ISLAND CITY. NY 11120 | $449.344 | $329.256 |
| THE BANK OF NEW YORK MELLON (as trustee of Citigroup Pension Plan Trust) | ONE WALL STREET NEW YORK. NY 10286 | $449.344 | $329.256 |

* Redacted pursuant to Section 21.3 of the S.D.N.Y. Electronic Case Filing Rules & Instructions (Apr. 4, 2011 ed.).

| Name | Address | Shareholder Transfers | |
|---|---|---|---|
| | | Step One | Step Two |
| DEEPHAVEN EVENT TRADING LTD. | c/o M&C CORPORATE SERVICES LIMITED UGLAND HOUSE SOUTH CHURCH STREET GEORGE TOWN GRAND CAYMAN KY1-1104 CAYMAN ISLANDS | $522.996 | |
| DEEPHAVEN GROWTH OPPORTUNITIES TRADING LTD. | c/o HWR SERVICES CRAIGMUIR CHAMBERS P.O. BOX 71 ROAD TOWN, TORTOLA BRITISH VIRGIN ISLANDS | $522.996 | |
| DIOCESE OF BUFFALO LAY PENSION PLAN | 795 MAIN STREET BUFFALO, NY 14203 | $74.562 | $54.638 |
| DORIS DUKE CHARITABLE FOUNDATION | 650 FIFTH AVENUE 19TH FLOOR NEW YORK, NY 10019 | $147.152 | |
| 1199SEIU GREATER NEW YORK PENSION FUND | 330 WEST 42ND STREET NEW YORK, NY 10036 | $206.040 | $150.960 |
| 1199SEIU HEALTH CARE EMPLOYEES PENSION FUND | 330 WEST 42ND STREET NEW YORK, NY 10036 | $3.533.892 | $934.592 |
| 1199SEIU HOME CARE EMPLOYEES PENSION FUND | 330 WEST 42ND STREET NEW YORK, NY 10036 | $72.590 | $53.210 |
| EVOL CAPITAL MANAGEMENT LLC | c/o NATIONAL CORPORATE RESEARCH, LTD. 615 SOUTH DUPONT HIGHWAY DOVER, DE 19901 | | $262.616 |
| FIDUCIARY TRUST COMPANY INTERNATIONAL | 600 FIFTH AVENUE 4TH FLOOR NEW YORK, NY 10020-2302 | $584.630 | $855.542 |
| FIRST NEW YORK SECURITIES LLC | 90 PARK AVENUE 5TH FLOOR NEW YORK, NY 10016 | $456.892 | |
| FLINDERS, HAIDEE W. | ███████████ HONEOYE FALLS, NY ███ | | $97.410 |
| GABELLI ASSOCIATES FUND | ONE CORPORATE CENTER RYE, NY 10580 | | $2.074.000 |

3

* Redacted pursuant to Section 21.3 of the S.D.N.Y. Electronic Case Filing Rules & Instructions (Apr. 4, 2011 ed.).

| Name | Address | Shareholder Transfers | |
|---|---|---|---|
| | | Step One | Step Two |
| GABELLI MULTIMEDIA PARTNERS, L.P. | ONE CORPORATE CENTER RYE, NY 10580 | | $100,640 |
| GABELLI PERFORMANCE PARTNERSHIP, L.P. | ONE CORPORATE CENTER RYE, NY 10580 | $333,574 | $244,426 |
| HORWITZ, DONALD | ███████ BROOKLYN, NY ██████ | $91,052 | $66,708 |
| HORWITZ, LOLA L. | ███████ BROOKLYN, NY ██████ | $446,862 | $313,480 |
| INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 14-14B PENSION FUND | 141-57 NORTHERN BOULEVARD FLUSHING, NY 11354-4238 | $80,444 | $58,956 |
| iSHARES TRUST (iShares Dow Jones U.S. Consumer Services Sector Index Fund) | c/o THE CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 | | $336,974 |
| iSHARES TRUST (iShares Dow Jones U.S. Index Fund f/k/a iShares Dow Jones U.S. Total Market Index Fund) | c/o THE CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 | | $118,354 |
| iSHARES TRUST (iShares Morningstar Mid Value Index Fund) | c/o THE CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 | | $404,668 |
| iSHARES TRUST (iShares Russell 1000 Index Fund) | c/o THE CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 | | $750,618 |
| iSHARES TRUST (iShares Russell 1000 Value Index Fund) | c/o THE CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 | | $4,187,372 |
| iSHARES TRUST (iShares Russell 3000 Index Fund) | c/o THE CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 | | $518,568 |

* Redacted pursuant to Section 21.3 of the S.D.N.Y. Electronic Case Filing Rules & Instructions (Apr. 4, 2011 ed.).

| Name | Address | Shareholder Transfers | |
| | | Step One | Step Two |
|---|---|---|---|
| iSHARES TRUST (iShares Russell 3000 Value Index Fund) | c/o THE CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE  19801 | | $255,306 |
| iSHARES TRUST (iShares Russell MidCap Index Fund) | c/o THE CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE  19801 | | $2,662,268 |
| iSHARES TRUST (iShares Russell MidCap Value Index Fund) | c/o THE CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE  19801 | | $4,836,058 |
| iSHARES TRUST (iShares S&P 500 Index Fund) | c/o THE CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE  19801 | | $3,938,764 |
| iSHARES TRUST (iShares S&P 500 Value Index Fund) | c/o THE CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE  19801 | | $2,091,170 |
| JPMORGAN TRUST II (JPMorgan Equity Index Fund) | 270 PARK AVENUE NEW YORK, NY  10017 | | $405,008 |
| LANGDON STREET CAPITAL, L.P. | 555 FIFTH AVENUE 14TH FLOOR NEW YORK, NY  10017 | $231,540 | |
| LOCKHEED MARTIN CORP. | 420 LEXINGTON AVENUE NEW YORK, NY  10170 | $1,461,830 | $1,662,600 |
| LOEB ARBITRAGE B FUND LP | 61 BROADWAY 24TH FLOOR NEW YORK, NY  10006 | | $646,476 |
| LOEB OFFSHORE FUND, LTD. | 61 BROADWAY 24TH FLOOR NEW YORK, NY  10006 | | $239,938 |
| LOEB OFFSHORE B FUND, LTD. | 61 BROADWAY 24TH FLOOR NEW YORK, NY  10006 | | $383,112 |

| Name | Address | Shareholder Transfers | |
| --- | --- | --- | --- |
| | | Step One | Step Two |
| LOEB PARTNERS CORPORATION | 61 BROADWAY 24TH FLOOR NEW YORK, NY  10006 | $123,930 | |
| MASTER INVESTMENT PORTFOLIO (S&P 500 Stock Master Portfolio) | 55 EAST 52ND STREET NEW YORK, NY  10055 ATTN:  JOHN M. PERLOWSKI | | $604,214 |
| MERCER FUNDS (MGI US Small/Mid Cap Value Equity Fund) | 1166 AVENUE OF THE AMERICAS NEW YORK, NY  10166 | | $149,600 |
| NATIXIS FINANCIAL PRODUCTS LLC | 9 WEST 57TH STREET NEW YORK, NY  10019 | | $636,718 |
| NEW YORK CITY FIREFIGHTERS' VARIABLE SUPPLEMENTS FUND | 9 METROTECH CENTER BROOKLYN, NY  11201 | $81,260 | $51,136 |
| OPPORTUNITY PARTNERS LP | 60 HERITAGE DRIVE PLEASANTVILLE, NY  10570 | $129,506 | |
| PAPER PRODUCTS, MISCELLANEOUS CHAUFFEURS, WAREHOUSEMEN, HELPERS, MESSENGERS, PRODUCTION AND OFFICE WORKERS LOCAL 27 PENSION FUND | 45-18 COURT SQUARE 6TH FLOOR LONG ISLAND CITY, NY  11101 | $231,540 | $169,660 |
| PAVERS AND ROAD BUILDERS DISTRICT COUNCIL PENSION FUND | 136-25 37TH AVENUE FLUSHING, NY  11354-4167 | $104,040 | $76,194 |
| QUANTITATIVE MASTER SERIES LLC (Master S&P 500 Index Series) | 55 EAST 52ND STREET NEW YORK, NY  10055 ATTN:  JOHN M. PERLOWSKI | $799,442 | $802,808 |
| RBC CAPITAL MARKETS LLC | 3 WORLD FINANCIAL CENTER 200 VESEY STREET NEW YORK, NY  10281 | $22,834,332 | $11,250,770 |
| REFORM PENSION BOARD TRUST | 355 LEXINGTON AVENUE 18TH FLOOR NEW YORK, NY  10017 | $196,248 | $143,786 |

| Name | Address | Shareholder Transfers | |
| --- | --- | --- | --- |
| | | Step One | Step Two |
| SCOTIA CAPITAL INC. | 40 KING STREET WEST<br>33RD FLOOR<br>TORONTO, ONTARIO  M5W 2X6<br>CANADA | $8,603,700 | $110,500 |
| STICHTING PENSIOENFONDS CAMPINA | HOUTTUINLAAN 4<br>3447 GM WOERDEN<br>THE NETHERLANDS | $237,456 | $173,978 |
| TAX MANAGED OPPORTUNITY FUND LLC | c/o CT CORPORATION SYSTEM<br>111 EIGHTH AVENUE<br>NEW YORK, NY  10011 | | $1,085,722 |
| TE CALEL PORTFOLIO, LTD. | | $512,142 | $98,600 |
| THE CHURCH PENSION FUND | 445 FIFTH AVENUE<br>NEW YORK, NY  10016 | $822,154 | $149,226 |
| THE CONSOLIDATED EDISON RETIREMENT PLAN | c/o CONSOLIDATED EDISON OF NEW YORK, INC.<br>4 IRVING PLACE<br>15TH FLOOR SOUTH<br>NEW YORK, NY  10003<br>ATTN:  MARY ADAMO | $1,102,756 | |
| STATE STREET BANK AND TRUST COMPANY (as trustee of The Consolidated Edison Retirement Plan) | ONE LINCOLN STREET<br>BOSTON, MASSACHUSETTS  02111 | $1,102,756 | |
| THE DREYFUS CORPORATION | 200 PARK AVENUE<br>NEW YORK, NY  10166 | | $1,899,818 |
| THE NORTHERN TRUST COMPANY (as trustee of the Master Trust Between Pfizer Inc. and The Northern Trust Company (as successor to Wyeth Master Trust)) | 50 LASALLE STREET<br>CHICAGO, ILLINOIS  60675 | $786,828 | $576,572 |
| THE NORTHERN TRUST COMPANY (as trustee of The Reader's Digest Association, Inc. Retirement Plan) | 50 LASALLE STREET<br>CHICAGO, ILLINOIS  60675 | $225,658 | $165,342 |
| THE READER'S DIGEST ASSOCIATION INC. RETIREMENT PLAN | 750 THIRD AVENUE<br>4TH FLOOR<br>NEW YORK, NY  10017 | $225,658 | $165,342 |

| | | Shareholder Transfers | |
| --- | --- | --- | --- |
| *Name* | *Address* | *Step One* | *Step Two* |
| THE TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK | 55 WATER STREET NEW YORK, NY 10041 | $676,090 | $1,322,396 |
| TOMPKINS FINANCIAL CORPORATION | 121 EAST SENECA STREET ITHACA, NY 14850 | $81,906 | $60,044 |
| UNITED TEAMSTERS PENSION FUND "A" | 2137-2147 UTICA AVENUE BROOKLYN, NY 11234 | $82,416 | $60,384 |

# Exhibit B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| TRIBUNE COMPANY, et al.,[1] | ) | Case No. 08-13141 (KJC) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | D.I. 5591, 8201 |

## ORDER GRANTING (I) RELIEF FROM THE AUTOMATIC STAY TO THE EXTENT THE AUTOMATIC STAY BARS COMMENCEMENT BY CREDITORS OF STATE LAW CONSTRUCTIVE FRAUDULENT CONVEYANCE CLAIMS TO RECOVER STOCK REDEMPTION PAYMENTS MADE TO STEP ONE SHAREHOLDERS AND STEP TWO SHAREHOLDERS AND (II) LEAVE FROM THE MEDIATION ORDER TO PERMIT COMMENCEMENT OF LITIGATION ON ACCOUNT OF SUCH CLAIMS

Upon the motion dated March 1, 2011 of Aurelius Capital Management, LP, on

behalf of its managed entities (collectively "Aurelius"), Deutsche Bank Trust Company

Americas, in its capacity as successor indenture trustee for certain series of senior notes issued

by Tribune Company ("Deutsche Bank"), and Law Debenture Trust Company of New York, in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

its capacity as successor indenture trustee for certain series of senior notes issued by Tribune

Company ("Law Debenture" and, collectively with Aurelius, Deutsche Bank and Wilmington

Trust Company, in its capacity as successor indenture trustee for the PHONES notes issued by

Tribune Company, the "Original Plaintiff Group"), for entry of an order (I) determining that

creditors have regained their state law constructive fraudulent conveyance claims to recover

stock redemption payments made to Step One Shareholders (as defined below) and Step Two

Shareholders (as defined below) due to the expiration of the statute of limitations under 11

U.S.C. § 546(a); (II) determining that the automatic stay does not bar the commencement of

litigation by or on behalf of creditors with respect to such claims or, in the alternative, granting

relief from the automatic stay to permit the commencement of such litigation; and (III) granting

leave from this Court's Order Appointing Mediator [*ECF No*. 5591] (the "Mediation Order") to

permit the commencement of such litigation (the "Motion"); and it appearing that good and

sufficient notice of the Motion was given and that no other or further notice is necessary; and the

Court having considered the Motion at a hearing on March 22, 2011 (the "Hearing"); and the

Court having overruled the objections to the Motion for the reasons stated at the Hearing; and

after due deliberation and it appearing sufficient cause exists for granting the requested relief, it

is therefore

ORDERED, ADJUDGED AND DECREED that:

1. The Motion is GRANTED to the extent set forth herein.

2. Because no state law constructive fraudulent conveyance claims against

shareholders whose stock was redeemed or purchased in connection with the first step (such

shareholders, the "Step One Shareholders") and/or the second step (such shareholders, the "Step

Two Shareholders") of the 2007 leveraged buy-out of Tribune Company (the "LBO") were

commenced by or on behalf of the Debtors' estates before the expiration of the applicable statute

of limitations under 11 U.S.C. § 546(a), the Debtors' creditors have regained the right, if any, to prosecute their respective state law constructive fraudulent conveyance claims against Step One Shareholders and/or Step Two Shareholders to recover stock redemption/purchase payments made to such shareholders in connection with the LBO (collectively, the "Creditor SLCFC Claims").

3.      To the extent the automatic stay of 11 U.S.C. § 362(a) stays the commencement of any Creditor SLCFC Claims, the automatic stay is hereby lifted to permit the filing of any complaint by or on behalf of creditors on account of such Creditor SLCFC Claims, including, without limitation, any complaint filed by any plaintiff in the Original Plaintiff Group.

4.      To the extent the Mediation Order stays the commencement of any Creditor SLCFC Claims, leave is hereby granted from such Mediation Order to permit the filing of the complaint(s) referenced in paragraph 3 above.

5.      To the extent that a creditor other than a member of the Original Plaintiff Group seeks to file its own complaint with respect to its Creditor SLCFC Claims, such creditor shall file a statement in this Court acknowledging that the creditor shall, except as provided in and in accordance with paragraph 6 below, stay all actions in the state court litigation and will otherwise adhere to the terms of this Order.

6.      Absent further order of this Court, litigation commenced by the filing of any complaint referenced in paragraphs 3 and 5 above shall automatically be stayed in the applicable state court(s) where such complaint(s) are filed, or if not automatic in such state court(s), then application for the stay in accordance with the provisions of this Order shall be made by the Original Plaintiff Group or any other creditor that files its own complaint; provided, however, that during such stay, any party, including any plaintiff in the Original Plaintiff Group, that files such a complaint may: (a) consistent with governing rules, amend such complaint; (b) complete

-3-

service of such complaint; and (c) take such steps, including immediately pursuing discovery, as are necessary solely for the purpose of preventing applicable statutes of limitations or other time-related defenses from barring any Creditor SLCFC Claims.

7.      Nothing in this Order shall prejudice the rights of the Official Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "Creditors' Committee") or any trust established under any plan of reorganization that is confirmed in the Debtors' chapter 11 cases, including to, as the case may be, (i) pursue whatever claims are properly asserted by the Creditors' Committee or by such trusts, in any proper venue, or (ii) amend in any way the adversary complaints (Adv. Pro. Nos. 10-53963 and 10-54010) filed by the Creditors' Committee in these chapter 11 cases, or take or seek to take any other action, or assert any rights or arguments, in connection with such claims or complaints.

8.      Nothing in this Order shall prejudice or impair any claims or defenses of any defendant in any proceeding in respect of a Creditor SLCFC Claim or any objection to any plan of reorganization currently before this Court.[2]

9.      This Court shall, except with respect to the prosecution of the Creditor SLCFC Claims, retain exclusive jurisdiction to hear and decide any and all disputes relating to or arising from this Order.

Dated: _____ , 2011
       Wilmington, Delaware

_____
HONORABLE KEVIN J. CAREY
Chief United States Bankruptcy Judge

cc: William P. Bowden, Esquire[3]

---

[2] For the avoidance of doubt, by this Order, this Court makes no finding and issues no ruling determining the standing of the Original Plaintiff's Group (or any creditor) to assert the Creditor SLCFC Claims or whether such claims are preempted or otherwise impacted by 11 U.S.C. § 546(e).

[3] Counsel shall serve a copy of this Order on all interested parties and file a Certificate of Service with this Court.

# Exhibit C

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                    )
                                          )    Chapter 11
TRIBUNE COMPANY, *et al.*,[1]             )    Case No. 08-13141 (KJC)
                                          )    Jointly Administered
         Debtors.                         )    Re: Docket Nos. 9248, 9293, 9335
                                          )

## ORDER GRANTING MOTION BY DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, LAW DEBENTURE TRUST COMPANY OF NEW YORK, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES AND WILMINGTON TRUST COMPANY IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR THE PHONES NOTES, TO CLARIFY, SUPPLEMENT OR MODIFY THIS COURT'S ORDER ENTERED APRIL 25, 2011 (ECF 8740) AND CROSS-MOTION OF CERTAIN STATE LAW CONSTRUCTIVE FRAUDULENT CONVEYANCE DEFENDANTS IN RESPECT OF STATE LAWCONSTRUCTIVE FRAUDULENT CONVEYANCE SUITS

---

[1]The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WCCT Inc., f/k/a WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Upon consideration of the motion (the "Motion")[2] dated June 14, 2011 of Deutsche Bank

Trust Company Americas, in its capacity as successor indenture trustee for certain series of

senior notes issued by Tribune Company, Law Debenture Trust Company of New York, in its

capacity as successor indenture trustee for certain series of senior notes issued by Tribune

Company, and Wilmington Trust Company, in its capacity as successor indenture trustee for the

PHONES notes issued by Tribune Company (collectively, the "Movants"), for entry of an order

clarifying, supplementing, or modifying the Court's *Order Granting (I) Relief From the*

*Automatic Stay to the Extent the Automatic Stay Bars Commencement By Creditors of State Law*

*Constructive Fraudulent Conveyance Claims to Recover Stock Redemption Payments Made to*

*Step One Shareholders and Step Two Shareholders and (II) Leave From the Mediation Order to*

*Permit Commencement of Litigation on Account of Such Claims*, dated April 25, 2011 [Dkt.

8740] (the "SLCFC Claims Order") to confirm that neither the automatic stay of Bankruptcy

Code section 362 nor the provisions of the SLCFC Claims Order prevent the Movants from (i)

moving to consolidate and/or coordinate the state law constructive fraudulent conveyance actions

commenced by the Movants, including, without limitation, by moving to consolidate them into

one MDL proceeding pursuant to 28 U.S.C. § 1407 and (ii) in the event that any one or more

SLCFC Courts or parties other than the Movants do not agree to stay the litigation of the state

law constructive fraudulent conveyance actions commenced by the Movants, taking appropriate

action to enforce the stay in the first instance and filing all appropriate responses in connection

with any motions, pleadings, or orders filed in such actions that were not so stayed; and upon the

responses to the Motion filed by certain retirees (the "Retiree Plaintiffs") of the Debtors who

commenced four separate state law constructive fraudulent conveyance actions; and upon

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

2

consideration of the cross-motion (the "Cross-Motion") dated June 21, 2011 of JPMorgan
Securities LLC, JPMorgan Clearing Corp., JPMorgan Chase Bank, N.A., Citicorp North
America, Inc., Citigroup Global Markets Inc., Merrill Lynch Capital Corporation, Merrill Lynch,
Pierce, Fenner & Smith Incorporated, Merrill Lynch & Co. Inc. and their affiliates, Bank of
America, N.A. and Banc of America Securities LLC, for entry of an order to clarify, supplement
or modify this Court's SLCFC Claims Order to permit defendants in any litigation concerning
the SLCFC Claims (hereinafter, the "SLCFC Actions") to seek to remove those suits to federal
court; and it appearing that good and sufficient notice of the Motion and Cross-Motion was given
and that no other or further notice is necessary; and the Court having considered the Motion and
the Cross-Motion at a hearing on June 28, 2011 (the "Hearing"); and all objections having been
resolved; and after due deliberation and it appearing sufficient cause exists for granting the
requested relief, it is therefore

     ORDERED, ADJUDGED AND DECREED that:

     1.    The Motion and the Cross-Motion are GRANTED to the extent set forth herein.

     2.    The SLCFC Claims Order is hereby supplemented to provide that (a) any plaintiff
or defendant in the SLCFC Actions is authorized to move to consolidate and/or coordinate the
SLCFC Actions, including, without limitation, by making a motion pursuant to 28 U.S.C. § 1407
and the applicable Rules of Procedure of the U.S. Judicial Panel on Multidistrict Litigation (the
"JPML Rules"), or any applicable state rules, or to move to amend or respond to such a motion;
(b) any defendant in the SLCFC Actions commenced in state court may seek to remove those
actions on any applicable ground; and (c) any party opposing such removal may file a timely
motion to remand and any party may respond to any such motion.

3

3.     Further, in the event that any one or more courts or parties in the SLCFC Actions do not agree to stay the litigation of the SLCFC Actions, any plaintiff or defendant in the SLCFC Actions is authorized to take all appropriate actions to enforce the stay in the first instance and to file all appropriate responses in connection with any motions, pleadings or orders filed in the SLCFC Actions that were not so stayed.

4.     Nothing in the Order shall prejudice or impair any claims or defenses of any defendant in any proceeding in respect of a SLCFC Claim or any objection to any plan of reorganization currently before this Court.[3]

5.     This Court shall, except with respect to the prosecution of the SLCFC Claims, retain exclusive jurisdiction to hear and decide any and all disputes relating to or arising from this Order.

Dated:     _____, 2011
           Wilmington, Delaware

                              _____
                              HONORABLE KEVIN J. CAREY
                              Chief United States Bankruptcy Judge

---

[3] For the avoidance of doubt, by this Order, this Court makes no finding and issues no ruling determining the standing of the Original Plaintiff's Group (or any creditor) to assert the Creditor SLCFC Claims or whether such claims are preempted or otherwise impacted by 11 U.S.C. §546(e).

4